## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| HOUSE OF FLAVORS, INC., ) | |
| ) | |
| PLAINTIFF ) | |
| ) | |
| v. ) | CIVIL NO. 09-72-P-H |
| ) | |
| TFG-MICHIGAN, L.P., ) | |
| ) | |
| DEFENDANT ) | |

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

This is a dispute over whether a Utah company breached an agreement to sell ice cream machinery to a Maine company at a set purchase price at the end of an equipment lease. The lease does not contain a purchase price. Before signing the lease, the Utah company, TFG-Michigan ("Tetra"), sent the Maine company, House of Flavors, Inc. ("House of Flavors"), a letter estimating the end-of-term purchase price for the machinery. In due course, House of Flavors tried to buy the equipment at the estimated price, and Tetra refused to sell at that price.

On the defendant Tetra's motion for summary judgment, I conclude that there is no genuine issue of material fact on House of Flavors's claims of breach of contract, breach of implied covenant of good faith and fair dealing, and breach of the Utah Unfair Practices Act. But there is a genuine issue of material fact as to whether Tetra used the estimate letter fraudulently to induce House of Flavors to sign the lease. Since there is a genuine issue as to

fraud during negotiations, there is also, necessarily, a genuine issue as to promissory estoppel since the lease could either be voidable for fraud or void for procedural unconscionability.  I therefore **DENY** summary judgment to Tetra on House of Flavors's fraud and promissory estoppel claims but **GRANT** summary judgment to Tetra on the breach of contract, breach of implied covenant of good faith and fair dealing, and unfair practices claims.

## STATEMENT OF FACTS

### (1)    *Undisputed Facts*

In October 2005, House of Flavors decided to acquire an ice cream hardening system at auction.[1]  For financing, it opened negotiations with Tetra, an equipment leasing company, Orix (another leasing company), and Fifth Third Bank.[2]  House of Flavors president Whitcomb Gallagher and vice-president Sarah Holmes spoke with Tetra senior vice-president Greg Emery about having Tetra buy the equipment and lease it back to House of Flavors.[3]  During negotiations, Gallagher told Emery and Tetra's executive vice-president Ryan Secrist that House of Flavors needed a firm commitment on an end-of-term purchase price.[4]  He rejected a proposal to set the price at no more than 20 percent of original cost.[5]

---

[1] Def. TFG-Michigan's Statement of Material Facts in Support of its Mot. for Summ. J. ("SMF") ¶¶ 19-20 (Docket Item 19); Pl. House of Flavors, Inc.'s Opposing Statement of Material Facts ("OSMF") and Statement of Additional Facts ("SAF") ¶¶ 19-20 (of OSMF) (Docket Item 25).
[2] Pl.'s SAF ¶¶ 6-7; Def. TFG-Michigan's Reply Statement of Material Facts ("RSMF") ¶¶ 6-7 (Docket Item 29).
[3] Def.'s SMF ¶¶ 12, 17, 3, 22; Pl.'s OSMF ¶¶ 12, 17, 3, 22.
[4] Def.'s SMF ¶¶ 4, 25; Pl.'s OSMF ¶¶ 4, 25.
[5] Def.'s SMF ¶¶ 24-25; Pl.'s OSMF ¶¶ 24-25.

On November 10, 2005, House of Flavors submitted a winning bid for the equipment at auction,[6] and on November 22, 2005, signed a letter of intent to have Tetra finance the purchase and lease the equipment back to House of Flavors.[7]  Although the November letter of intent included the 20 percent purchase price, Tetra's Secrist, at Gallagher's request, sent House of Flavors a separate letter ("first estimate letter") that stated in relevant part:[8]

> Pursuant to our conversation, we have reviewed the list of property expected to be purchased and have estimated a value of ten percent (10%) of its original cost.  Please note that this end of term value estimation is not intended to represent  a commitment by you, or an obligation by us, to buy or sell the equipment, as the case may be for that, or any other price at the conclusion of the Base (or extended, if applicable) Lease Term.[9]

Tetra later informed House of Flavors that it could not complete the deal on the existing terms and submitted an alternative proposal for financing the equipment purchase.[10]  Tetra also sent a revised estimate letter ("second estimate letter") to House of Flavors on January 5, 2006, increasing the estimated purchase price to 12 percent of cost.[11]  The second estimate letter was in other material respects identical to the first.[12]  Notwithstanding the statement in both estimate letters that Tetra had "reviewed the list of property

---

[6] Def.'s SMF ¶¶ 20-21; Pl.'s OSMF ¶¶ 20-21.  House of Flavors qualifies Tetra's statement regarding the cost of the equipment.  Pl.'s OSMF ¶ 21.

[7] Def.'s SMF ¶¶ 22-23; Pl.'s OSMF ¶¶ 22-23.

[8] Def.'s SMF ¶¶ 24, 26; Pl.'s OSMF ¶¶ 24, 26.

[9] November 22, 2005 Letter to Gallagher (Ex. 3, pt. 2, to Def.'s SMF at 11) (Docket Item 19-4); see also Def.'s SMF ¶ 26; Pl.'s OSMF ¶ 26.

[10] Def.'s SMF ¶¶ 27-28; Pl.'s OSMF ¶¶ 27-28.

[11] Def.'s SMF ¶ 30; Pl.'s OSMF ¶ 30.  House of Flavors denies that Gallagher requested the second estimate letter and states that Secrist sent it of his own accord.  House of Flavors's denial does not otherwise controvert Tetra's statement regarding the fact of the letter or its contents.  Pl.'s OSMF ¶ 30.

[12] See January 5, 200[6] Letter to Gallagher (Ex. 3, pt. 2, to Def.'s SMF at 13) (Docket Item 19-4).

expected to be purchased and ha[d] estimated an end of term value,"[13] Tetra in fact "did not estimate the end of term purchase price prior to the execution of the Lease."[14]

Gallagher subsequently negotiated a lease with Emery and Secrist but did not discuss the second estimate letter during the negotiations.[15]  Gallagher signed the lease for House of Flavors on February 28, 2006.[16]  According to its terms, the lease expires in spring 2009.[17]

The lease includes a provision regarding contract integration and a provision laying out the options available to House of Flavors at the end of the lease.  Paragraph 19(a) of the lease states:

> This Lease and all Schedules duly executed and attached hereto from time to time constitute the entire agreement between the parties hereto with respect to the Equipment, and any modification hereto and any related agreement must be in writing and signed by the parties hereto.[18]

Paragraph 19(d) of the lease provides House of Flavors with three options at the end of the initial lease term.[19]  It states in relevant part:

> Upon the completion of the Base Term of any Lease, Lessee shall . . . elect one of the following options:  (i) purchase all, but not less than all, of the Items of Equipment for a price to be agreed upon by both the Lessor and . . . .  Lessee, (ii) extend the Lease for twelve (12) additional months at the rate specified on the respective Schedule, or (iii) return the Equipment to the Lessor . . . .  With respect to options (i) and (iii), each party shall have the right in its absolute and

---

[13] November 22, 2005 Letter to Gallagher; January 5, 200[6] Letter to Gallagher.
[14] Pl.'s OSMF ¶ 20; Def.'s RSMF ¶ 20.  Tetra qualifies House of Flavors's statement that Tetra had not estimated a purchase price at the time it sent the first estimate letter by stating that Gallagher requested that Tetra include an estimate figure in the letter.  Def.'s RSMF ¶ 20.
[15] Def.'s SMF ¶¶ 32, 37; Pl.'s OSMF ¶¶ 32, 37.
[16] Def.'s SMF ¶ 38; Pl.'s OSMF ¶ 38.
[17] Def.'s SMF ¶ 29; Pl.'s OSMF ¶ 29; see also Master Lease Agreement at 1 (Ex. 3, pt. 2, to Def.'s SMF at 34) (Docket Item 19-4).
[18] Def.'s SMF ¶ 33; Pl.'s OSMF ¶ 33; see also Master Lease Agreement at 13.
[19] Def.'s SMF ¶ 35; Pl.'s OSMF ¶ 35; see also Master Lease Agreement at 13-14.

4

> sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable.   In the event Lessor and Lessee have not agreed to either option (i) or (iii) by the end of the Base Term . . . then option (ii) shall apply at the end of the Base Term.   At the conclusion of the extension period provided for in option (ii) above, the Lease shall continue . . . for successive periods of six (6) months each subject to termination at the end of any such successive period by either Lessor or Lessee [with required notice].[20]

The lease document does not otherwise specify an end-of-term purchase price or explicitly mention the estimate letters that Tetra sent to House of Flavors in November 2005 and January 2006.

In August 2008, House of Flavors attempted to purchase the equipment for 12 percent of original cost.[21]   Tetra ultimately countered with a sale price of 30 percent of cost.[22]   During negotiations in October 2008, Gallagher sent a letter to Tetra stating that the estimate letters were not legally binding agreements.[23]   The parties negotiated without success over price, and this lawsuit ensued.

### (2)      *Disputed Facts*

House of Flavors states that Emery and Secrist told Gallagher during the lease negotiations that the 20 percent purchase price in the November letter of intent was a "cap" and that the parties could probably agree to a purchase price in the range of 10 to 12 percent of cost.[24]   At his deposition, Gallagher testified, first, that he told Emery and Secrist that he needed Tetra to commit

---

[20] Master Lease Agreement at 13-14.
[21] Pl.'s SAF ¶ 31; Def.'s RSMF ¶ 31.
[22] Def.'s SMF ¶ 46; Pl.'s OSMF ¶ 46.
[23] Def.'s SMF ¶¶ 48-49; Pl.'s OSMF ¶¶ 48-49.   House of Flavors qualifies Tetra's description of the October 2008 letter by quoting an additional section of the letter.   Pl.'s OSMF ¶ 49; see also October 15, 2008 Letter to Ryan Secrist at 2 (Ex. 3, pt. 2, to Def.'s SMF at 53) (Docket Item 19-4).
[24] Pl.'s SAF ¶ 12.

the purchase price to writing before House of Flavors could sign a lease and, second, that Secrist agreed to provide a written estimate "that would effectively memorialize [the] agreement with regard to the 10 percent buyout," but told Gallagher that, for Tetra tax reasons, the estimate would have to be "vague" and could not be an "exact final valuation."[25]  House of Flavors also states that Tetra sent the second estimate letter in January 2006 on its own initiative rather than in response to a request from Gallagher.[26]  Gallagher has stated under oath that he signed the lease for House of Flavors believing that the parties had agreed on an end-of-term purchase price of 12 percent of cost.[27]  House of Flavors states that it did not have a preferred tax treatment for the lease.[28]  Tetra states, however, that it sent the estimate letters with the 10 and 12 percent price estimates because "Gallagher requested that those specific figures be included and because House of Flavors needed a number for internal accounting purposes."[29]

### PROCEDURAL SETTING

House of Flavors sued Tetra under Utah law for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, promissory estoppel, and violation of the Utah Unfair Practices Act.[30]  Tetra moved for summary judgment, arguing that the lease is a fully integrated contract that does not include a purchase price for the equipment.

---

[25] Id. ¶¶ 13-17; see also Dep. of Whitcomb Gallagher 94:9-11, July 31, 2009 (Ex. 3, pt. 1, to Def.'s SMF at 25) (Docket Item 19-3).
[26] Pl.'s OSMF ¶ 30.
[27] Pl.'s SAF ¶ 26.
[28] Id. ¶ 28.
[29] Def.'s RSMF ¶ 12, 13-18, 20 (Docket Item 29).
[30] The parties agree that Utah law governs the lease.

Tetra also contends that Utah law does not support the plaintiff's breach of covenant or unfair practices claims; that promissory estoppel does not apply in the context of a valid contract; and that the estimate letter could not reasonably have induced House of Flavors into signing the lease.

**ANALYSIS**

**_(1)     Breach of Contract_**

House of Flavors contends that in Paragraph 19(d) of the lease, the parties provided that the purchase price would be established outside the lease document, that the second estimate letter is the "agreed upon" price that Paragraph 19(d) contemplates, and that the letter satisfies Paragraph 19(a)'s requirement that "any related agreement must be in writing."   Tetra maintains that the Paragraph 19(d) language that price is "to be agreed upon" demonstrates that any agreement on price was in the _future_, whereas the second estimate letter preceded the lease execution by several weeks. Moreover, it points out that the estimate letter states explicitly that it does _not_ represent "an obligation" by Tetra to sell the equipment at that price.[31]

I conclude that the contract documents do not create a contractual obligation on Tetra's part to sell the machinery to House of Flavors for 12 percent of cost.   Even if I conclude that the lease document permits consideration of the estimate letter, there is nothing ambiguous in the estimate letter's statement that Tetra has no obligation to sell at the 12 percent price.

---

[31] See November 22, 2005 Letter to Gallagher; January 5, 200[6] Letter to Gallagher.   ("Please note that this end of term value estimation is not intended to represent a commitment by you, or an obligation by us, to buy or sell the equipment, as the case may be for that, or any other price at the conclusion of the Base (or extended, if applicable) Lease Term.").

House of Flavors explicitly does not rely upon an ambiguity argument to bring in parol evidence about what the parties otherwise agreed.[32]   As a result, on the clear language of the documents, Tetra is entitled to summary judgment on the breach of contract count.

**(2)     *Breach of the Implied Covenant of Good Faith and Fair Dealing***

House of Flavors also asks me to find that Tetra breached the implied covenant of good faith and fair dealing by refusing to sell the ice cream equipment at 12 percent of cost, the price of the second estimate letter.[33] Under Utah law, "good faith and fair dealing are implied terms of every contract,"[34] but the duties of good faith and fair dealing are limited to the terms of a contract and "have no independent existence."[35]   Here, I have concluded that nothing in the lease required Tetra to sell the equipment at 12 percent of cost.   To be sure, Tetra could have breached its duties of good faith and fair dealing by refusing to negotiate with House of Flavors about a purchase price.[36]   But as House of Flavors concedes, Tetra began negotiations of the

---

[32] House of Flavors makes contradictory assertions on this point, arguing both that parol evidence does not come into play and that I should consider the context of the discussions in interpreting the estimate letter. See Pl. House of Flavors, Inc.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 10 (Docket Item 24).   It also suggests that Tetra might argue that the estimate letter is ambiguous, id., but Tetra does not do so.  House of Flavors also admitted during the 2008 negotiations that the estimate letters are not, by their terms, legally binding. See Pl.'s OSMF ¶ 49 (qualifying Def.'s SMF ¶ 49).  As I have stated in text, the estimate letter is not at all ambiguous.  Therefore, I do not consider other evidence.  See Tangren Family Trust v. Tangren, 182 P.3d 326, 330 (Utah 2008) (holding that absent fraud, extrinsic evidence may not be used to vary or add to the terms of an integrated contract (quoting Hall v. Process Instruments & Control, Inc., 890 P.2d 1024, 1026 (Utah 1995)); Giusti v. Sterling Wentworth Corp., 201 P.3d 966, 975 (Utah 2009) (explaining that parol evidence may clarify contractual ambiguities).

[33] Pl.'s Mem. in Opp'n at 13; Compl. and Demand for Jury Trial ¶¶ 42-44 (Docket Item 1).

[34] Peterson & Simpson v. IHC Health Servs., 217 P.3d 716, 722 (Utah 2009) (quoting Christiansen v. Farmers Ins. Exch., 116 P.3d 259, 262 (Utah 2005)).

[35] Id.

[36] See Christiansen, 116 P.3d at 262 ("[T]he refusal to bargain or settle, standing alone, may, *(continued on next page)*

purchase price in 2008 at 39 percent of cost and came down to approximately 30 percent of cost while House of Flavors refused to move from the 12 percent figure in the second estimate letter.[37]  I conclude that on the undisputed facts, Tetra has not breached the covenant of good faith and fair dealing.

**(3)** *Fraudulent Inducement*

House of Flavors asserts that Tetra's Emery and Secrist made fraudulent statements to induce Gallagher to sign the lease.  I find that there is a genuine issue of material fact on the fraud claim regarding Tetra's use of the estimate letters during negotiation of the lease.  "The elements of a fraud claim include the following: (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage."[38]

Although the estimate letters disavow any Tetra "obligation" to sell at the estimated price, House of Flavors says through Gallagher's deposition that Secrist represented that the estimate letters did in fact memorialize an agreement, but that the letter had to be "vague" and could not be an "exact"

---

under appropriate circumstances, be sufficient to prove a breach." (quoting <u>Beck v. Farmers Ins. Exch.</u>, 701 P.2d 795, 798 (Utah 1985)).

[37] Pl.'s OSMF ¶¶ 46-47.

[38] <u>Giusti</u>, 201 P.3d at 977 n.38 (quoting <u>Dugan v. Jones</u>, 615 P.2d 1239, 1246 (Utah 1980)).

valuation only because of Tetra's tax needs.[39]   Gallagher also testified that he told Tetra that he would not sign a lease without assurance as to the final purchase price.[40]   Tetra concedes that it sent at least one estimate letter to Gallagher in response to his concern.[41]   Gallagher testified that he only signed a letter of intent with Tetra once he received the first estimate letter[42] and that he believed that he had an agreement with Tetra on the purchase price when he signed the lease.[43]

Tetra disputes these assertions, but they are enough to avoid summary judgment.  Based on this record, a jury could reasonably conclude that Tetra represented to House of Flavors that it had estimated the end-of-term cost (even though it had not) so as to satisfy Gallagher's concerns about locking down the purchase price before signing the lease; that Secrist told Gallagher the estimate letters memorialized an agreement knowing that they did not; and that Secrist offered the tax explanation for the wording of the estimate letters to mislead Gallagher.  A jury could also reasonably find that Gallagher signed the contract with Tetra because Secrist's explanation was reasonable and that Gallagher, without knowing that Secrist had misled him, believed that the companies had agreed on a price and therefore signed the lease—a lease whose

---

[39] Pl.'s Mem. in Opp'n at 14.   The estimate letters say that Tetra has reviewed the list of property to be purchased, but Tetra states now that, in fact, it did not do so.  Def.'s RSMF ¶ 20. It would be reasonable for a jury to infer that just as the estimate letter does not mean what it says regarding Tetra's review of the property and estimation of a sale price, it also does not mean what it says when it disclaims a price commitment.   Tetra maintains that House of Flavors cannot point to the misrepresentation of a presently existing fact, but the assertion that Secrist said that the estimate letters memorialize an agreement refers to a then presently existing fact.

[40] Id. at 14-15.

[41] Def.'s Mot. for Summ. J. at 4; see also Def.'s SMF ¶¶ 25-26.

[42] Pl.'s SAF ¶ 19.

[43] Id. ¶ 26.

terms actually allow Tetra now to demand a higher price for the equipment than it "estimated" in 2005 and 2006.

Summary judgment is not appropriate on the plaintiff's fraud claim.[44]

### (4)  *Promissory Estoppel and Unconscionability*

Tetra argues that House of Flavors cannot claim promissory estoppel because the lease is a valid, enforceable contract.[45]  But if House of Flavors prevails on its fraud claim, the lease will be voidable.  As explained in the discussion of fraud above, there are genuine issues of fact as to whether Gallagher reasonably relied on Tetra's representations about the purchase price; whether Emery and Secrist knew that Gallagher was relying on their representations; and whether Tetra proffered the estimate letters fraudulently to induce House of Flavors to enter the lease.  Those facts make out a case for promissory estoppel under Utah law.[46]  If House of Flavors voids the lease, promissory estoppel may apply.

Youngblood v. Auto-Owners Insurance Company does not alter that conclusion.  In Youngblood, a motorist admitted that the language of his insurance policy did not cover his claim, but sought to expand the scope of the policy based on misrepresentations of the policy's scope by the insurance agent who sold him the policy.[47]  The Utah Supreme Court reversed the trial court's determination that the motorist should be held to the plain language of the

---

[44] I note that under Utah law, "a contract induced by fraud . . . [is] voidable" at the election of the defrauded party.  Baldwin v. Burton, 850 P.2d 1188, 1193 n.15 (Utah 1993) (quoting Frailey v. McGarry, 211 P.2d 840, 845 (Utah 1949)).

[45] Mot. for Summ. J. at 14.

[46] Youngblood v. Auto-Owners Ins. Co., 158 P.3d 1088, 1092 (Utah 2007).

[47] Id. at 1090.

policy.  It found that the insurance agent made statements "in direct conflict with the language of the policy,"[48] and since "[r]eliance upon . . . material misrepresentations . . . may or may not be reasonable, depending on the facts of the individual case,"[49] it remanded the case for determination of the factual issues.  Here, House of Flavors argues that, like the insurance agent in Youngblood, Secrist materially misrepresented the extent of the parties' agreement.  Whether Gallagher reasonably relied on Tetra's representations is a question of fact.  A jury could conclude that Gallagher acted reasonably by telling Tetra that he needed a commitment on price and by negotiating a final draft of the lease only once he had the estimate letters in hand and had been assured by Secrist.[50]

---

[48] Id. at 1095.

[49] Id. at 1096.

[50] House of Flavors also claims promissory estoppel on the separate basis that Paragraph 19(d) is substantively unconscionable because it binds House of Flavors to a subsequent lease term if it does not agree with Tetra on a purchase price.  House of Flavors relies on Andin International Inc. v. Matrix Funding Corporation, 756 N.Y.S.2d 724 (N.Y. Sup. Ct. 2003), where the New York Supreme Court found that a lease involving a Utah company was unconscionable because it made it "almost impossible for a lessee to terminate its relationship with the lessor," id. at 726.  The lease in Andin provided that at the end of the lease, the lessee could buy the equipment "at a mutually agreeable price," extend the lease for another year, or "return the equipment in exchange for new equipment pursuant to a new lease."  Id.  The New York court concluded that if the lessee failed to choose, the second option applied, and the lease would renew indefinitely, and that under such a lease, a lessor could oppress a lessee by refusing to agree on a price.  Id.  The New York court decided the case under New York law, but noted that it might have concluded that a contract creating such a "perpetual obligation" could be "sufficiently one-sided and imbalanced" as to be unconscionable under Utah law as well.  Id. at 728.

Tetra's lease with House of Flavors is different.  Paragraph 19(d) provides that if House of Flavors does not agree on a price with Tetra or decide to return the equipment, the lease will renew for a term of eighteen months at the end of which either party can terminate the lease with proper notice.  See Master Lease Agreement at 13-14 (providing for a twelve-month renewal followed by a six-month extension).  This provision is, without doubt, burdensome, but it does not create a situation comparable to that in Andin.  Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 402 (Utah 1998) ("Even if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable.").  I conclude that the lease with Tetra is not void for substantive unconscionability.

House of Flavors's argument that promissory estoppel is available due to procedural unconscionability poses a closer question. While unconscionability is a question of law for the court rather than the trier of fact,[51] I cannot rule on procedural unconscionability in this case without a factual determination of House of Flavors's fraud claim.[52] Given the genuine issue of material fact as to fraud, I cannot rule out the possibility that this is the rare case where fraud during negotiations creates procedural unconscionability. I do remain doubtful that procedural unconscionability will survive as a practical matter.

### (5)   *Utah Unfair Practices Act*

The Utah Unfair Practices Act prohibits "[u]nfair methods of competition in commerce or trade."[53] In 2009, the Utah Supreme Court held that the statute lacks "an independent reference to unfair acts or practices" and therefore applies "only to anticompetitive behavior."[54] House of Flavors does not claim that Tetra's conduct harmed House of Flavors's ability to compete.

---

[51] <u>Sosa v. Paulos</u>, 924 P.2d 357, 360 (Utah 1996). The law provides different remedies for unconscionability and fraud. A finding of unconscionability renders a contract void. <u>Id.</u> at 359 (citing <u>Bekins Bar V Ranch v. Huth</u>, 664 P.2d 455, 459-62 (Utah 1983)). A finding of fraud only makes a contract voidable. <u>Ockey v. Lehmer</u>, 189 P.3d 51, 56 n.11 (Utah 2008) ("Contracts that offend an individual, such as those arising from fraud, misrepresentation, or mistake, are voidable. Only contracts that offend public policy or harm the public are void *ab initio*." (citing <u>Fletcher v. Stone</u>, 20 Mass. 250, 252 (1825)).

[52] House of Flavors also asserts its right, under Utah law, to a "reasonable opportunity to present evidence" of the lease's unconscionability. Pl.'s Mem. in Opp'n at 13; <u>see also</u> Utah Code Ann. § 70A-2-302(2) (2009). Utah law considers "a commercial transaction for the acquisition of equipment . . . in the form of a lease . . . [to be] a sale." <u>Colonial Leasing Co. v. Larsen Bros. Constr. Co.</u>, 731 P.2d 483, 485 (Utah 1986). However, House of Flavors has a right to a hearing even if the lease with Tetra is not construed as a sale of goods. <u>See</u> Utah Code Ann. § 70A-2a-108(3) (2009).

[53] Utah Code Ann. § 13-5-2.5 (2009); <u>see also</u> Utah Code Ann. § 13-5-17 (2009) ("[T]he purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and *to foster and encourage competition*, by prohibiting unfair and discriminatory practices by which fair and honest *competition* is destroyed or prevented. This act shall be liberally construed that its beneficial purposes may be subserved." (emphasis added)).

[54] <u>Garrard v. Gateway Fin. Servs.</u>, 207 P.3d 1227, 1230 (Utah 2009).

Rather, it argues that Tetra's practices allowed Tetra to gain "an unfair competitive advantage" over other potential finance companies "by making its terms seem more attractive" than those offered by companies "disclos[ing] [their] true intent regarding an end of term purchase price."[55]   That may be so, but the Utah Supreme Court suggested in <u>Garrard</u> that only competitors may state a claim under the Act and that it would require a legislative amendment for the Act to "protect consumers as well as commercial competitors."[56]   Under <u>Garrard</u>'s logic, House of Flavors is not a commercial competitor to Tetra, but a "consumer" that cannot claim an injury from Tetra's anticompetitive behavior vis-à-vis other competitors.   Thus, while Orix or Fifth Third Bank might have a claim that Tetra violated the Utah Unfair Practices Act,[57] House of Flavors does not.   Accordingly, since House of Flavors lacks standing under the statute, I need not determine if there is a genuine issue of material fact whether Tetra engaged in anticompetitive behavior.

## CONCLUSION

For the reasons stated above, Tetra's motion for summary judgment is **GRANTED** as to breach of contract (Count 1), breach of the covenant of good faith and fair dealing (Counts 2 and 3), and violation of the Utah Unfair

---

[55] Compl. ¶ 61.

[56] <u>Garrard</u>, 207 P.3d at 1230.   I note that the Court of Appeals of Utah had previously questioned whether the Utah statute is so limited given the plain language of the statute: "Any person . . . may maintain an action to enjoin a continuance of any act in violation of this chapter, and, if injured by the act, for the recovery of damages."   <u>See</u> <u>Russell v. Lundberg</u>, 120 P.3d 541, 547 (Utah Ct. App. 2005) (quoting Utah Code Ann. § 13-5-14).   But I follow the later Utah Supreme Court decision.

[57] Even this is uncertain because the statute limits the meaning of "commerce" to "intrastate commerce in the state of Utah."   Utah Code Ann. § 13-5-5 (2009).

Practices Act (Count 6) and **DENIED** as to fraud (Count 4) and promissory estoppel (Count 5).

**SO ORDERED.**

**DATED THIS 18TH DAY OF DECEMBER, 2009**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**