## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| HOUSE OF FLAVORS, INC., | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 09-72-P-H |
| | ) | |
| TFG-MICHIGAN, L.P., | ) | |
| | ) | |
| DEFENDANT | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a lawsuit over whether a financing company fraudulently induced an ice cream manufacturer to sign an equipment lease by misrepresenting that it had estimated an end-of-term buyout value for the leased equipment and by providing that value to the ice cream manufacturer to make the offered lease appear commercially competitive. I conducted a bench trial on April 13-15, 2010. These are my findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. House of Flavors is an ice cream maker, incorporated under Michigan law, with its corporate headquarters in Maine and its manufacturing plant in Michigan. House of Flavors is a subsidiary of Protein Holdings, Inc.

2. At all relevant times, Whitcomb Gallagher was and is the president of House of Flavors and the president and chief executive officer of Protein Holdings, Inc.

3.     Tetra Financial Group ("Tetra") is a Utah limited partnership in the business of equipment leasing.   TFG-Michigan is Tetra's operating entity in Michigan.

4.     Scott Scharman was the executive vice president of Tetra in 2005-2006 and is currently its chief executive officer.

5.     Ryan Secrist was a senior vice president (sales manager) at Tetra in 2005-2006 and is currently Tetra's executive vice president.

6.     Greg Emery was a national account executive (salesman) at Tetra in 2005-2006 and is currently a senior vice president at Tetra.

7.     In 2005, House of Flavors had production problems because ice cream containers at the bottom of pallets were compacting due to the ice cream being insufficiently hardened (frozen).

8.     As a result, House of Flavors decided to acquire an additional ice cream hardening system to remedy the problem.

9.     Coincidentally, in October 2005, Tetra's Emery cold-called Sarah Holmes, vice president of finance at House of Flavors, to inquire whether there were possible projects at House of Flavors that Tetra might finance.

10.     Holmes told Emery about the plan to acquire a hardening system and asked Emery about Tetra's ability to structure different kinds of financing deals.   Emery said that Tetra could offer financing through either a capital lease with a fixed buyout or an operating lease with end-of-term options to purchase the equipment, extend the lease, or return the equipment.

11.     In October 2005, House of Flavors met with its bank and decided that, given the soft costs related to installation of a hardening system, a bank

loan (which under its bank term loan agreement was limited to financing of hard assets) was not feasible.

12.    Thereafter, House of Flavors sought to finance the project through a lease with either Tetra or another financing company, Orix.

13.    On about October 18, 2005, Gallagher began discussing House of Flavors's financing needs with Tetra's Emery. Secrist subsequently joined the negotiations.

14.    Gallagher explained that he wanted to develop a long-term business relation with a leasing company.

15.    Gallagher told Emery and Secrist that House of Flavors intended to buy the hardening system at the end of any lease.

16.    Secrist told Gallagher that for tax reasons Tetra could not put a fixed buyout price into a lease.

17.    On October 28, 2005, Tetra sent Gallagher a draft letter of intent to fund House of Flavors's acquisition of a spiral tunnel hardening system for $1,500,000 by means of a five-year operating lease. See Letter of Intent from Whitcomb W. Gallagher to Tetra (Oct. 28, 2005) (Def.'s Ex. 2) ("Letter of Intent").[1] The Letter of Intent provided three options at the end of the lease: (i) House of Flavors could purchase the equipment at a price "not [to] exceed twenty percent (20%) of the original cost of equipment"; (ii) House of Flavors could extend the lease; or (iii) House of Flavors could return the equipment to

---

[1] Tetra drafted the Letter of Intent to be signed by Gallagher and sent back to Tetra.

Tetra.  <u>Id</u>.[2]  The Letter of Intent also stated that the lease would be a tax lease and that Tetra would receive all benefits of ownership of the leased equipment. <u>Id</u>.

18.  Gallagher called Emery and Secrist to discuss the Letter of Intent and told them that the twenty-percent buyout cap was not acceptable to him and that he needed an agreement about the end-of-term purchase price.

19.  Gallagher explained that he previously had an equipment lease in which the buyout price had not been set and that he ended up paying much more than anticipated.

20.  In response, Emery and Secrist told Gallagher that the twenty percent figure was a cap, but that most deals with Tetra closed with a buyout in the ten-to-twelve percent range and that Tetra could probably accomplish the same for House of Flavors.

21.  In early November 2005, House of Flavors learned that a tri-tray hardening system would be auctioned in Maryland.

22.  On November 10, 2005, the chief operating officer of House of Flavors attended the auction in Maryland and purchased the system for $105,000.

23.  On November 15, 2005, Gallagher informed Emery that the equipment had been purchased and, at Emery's request, sent him a document detailing three funding scenarios, each of which included both hard costs for

---

[2] Two subsequent letters of intent, dated November 18, 2005 and November 20, 2005, respectively, also included a buyout price cap at twenty percent of the original cost of the leased equipment. <u>See</u> Letter of Intent (Nov. 18, 2005) (Pl.'s Ex. 4); Letter of Intent (Nov. 20, 2005) (Joint Ex. 1).

the tri-tray system and associated equipment and soft costs for transportation, assembly, and installation of the system in the House of Flavors plant.

24.     To prepare for a later conference call with Secrist and Emery, Gallagher created agenda notes reflecting his need for a fixed buyout price. <u>See</u> E-mail from Emery to Gallagher, with Notes (Nov. 15, 2005) (Pl.'s Ex. 6).

25.     Gallagher wanted a buyout price from Tetra in order to compare Tetra's financing package with financing offered by Orix.

26.     On November 18, 2005, during the scheduled conference call, Gallagher pressed Secrist and Emery about locking down a buyout price and repeated his concerns with the twenty percent cap in Tetra's proposal. Secrist and Emery explained to Gallagher that the twenty percent cap had been included in the Letter of Intent because any number less than twenty percent would preclude Tetra from reaping certain tax advantages.[3]  But Secrist and Emery said that Tetra could provide a side letter reflecting a buyout value of twelve percent of cost.[4]  Secrist also assured Gallagher that Tetra had never lost a deal due to documentation issues and that he would not pursue a deal on terms that he did not think could be approved. <u>See</u> Handwritten Notes (Nov. 15, 2005) (Pl.'s Ex. 8).

---

[3] At trial, Secrist, Emery, and Scharman testified that Tetra's profit flowed in part from depreciating the equipment for tax purposes.

[4] Gallagher testified, "They said that we can give you a side letter that will set the price at 12 percent, but we can't give it to you in the format that you're going to be satisfied with because we need to maintain our position with the IRS, but what we can do is we'll give, you know, enough information there to say that effectively that we are agreeing to a 12 percent buyout." Gallagher Trial Test. Tr. 54:8-14, Apr. 13, 2010 (Docket Item 94).  Gallagher also testified that later "Ryan Secrist made the representation that the letter of intent—that they could do the deal, they could close the deal at 12 percent, and I said to him finally—somewhere along the line I said look, I've got to have that in writing, and he said he would put it in a side letter and we went through the reasons why he told me that the side letter had to be, what I would describe, as vague." <u>Id</u>. at 62:14-23.

27.     During this conversation, Secrist and Emery knew that they were competing for House of Flavors's business and that Gallagher needed a valuation of the buyout price to compare it to competing proposals.[5]  As Emery remembered the conversation, Gallagher told him, "I need to make sure the economics work on our end comparing it to our other options."

28.     In response to Gallagher's concerns about the end-of-term price, Secrist modified a pre-existing side letter from a different transaction and sent it to Gallagher on November 22, 2005.  This letter stated:

> Pursuant to our conversation, we have reviewed the list of property expected to be purchased and have estimated an end of term value of ten percent (10%) of its original cost.  Please note that this end of term value estimation is not intended to represent a commitment by you, or an obligation by us, to buy or sell the equipment, as the case may be for that, or any other price at the conclusion of the Base (or extended, if applicable) Lease Term.

Letter from Secrist to Gallagher (Nov. 22, 2005) ("first side letter") (Joint Ex. 2).

29.     When Secrist sent the first side letter, he and Emery knew that no one at Tetra had estimated or otherwise calculated an end-of-term value for the leased equipment either by appraising the equipment or by determining Tetra's cost of funds and necessary profit margin.[6]

---

[5] Emery testified, "Where we couldn't provide a fixed buyout on our letter of intent with our terms, he needed to for accounting purposes to be able to sell the transaction, our transaction to his board, to be able to run his accounting calculations, and I believe it was a competitive situation to where he was looking at our options and looking at the cost of funds."  (The only official transcript filed in this case was for testimony offered by Gallagher.  I therefore quote testimony from witnesses based on transcript rough drafts created in real time during proceedings and on notes.)

[6] Secrist testified that he was concerned with giving Gallagher a satisfactory number and with ensuring that the letter was nonbinding.

> Q And had someone estimated the end of term value at ten percent?
> A No. We did not do an estimate.
> Q Why did you phrase the letter that way?
> A It was, you know, as I think back, in putting the letter together, it was like I said, it was in the previous letter that I used and in my thinking was, you know, I want to make sure I got the number in there that he wanted and I had to make

*(continued on next page)*

30.     When Gallagher received the first side letter, he was surprised by the estimate at ten percent of cost rather than the twelve percent that he had discussed with Secrist, but he surmised that Tetra had re-run its numbers and had determined that it could offer a better deal.

31.     Shortly after receiving the first side letter, Gallagher signed the Letter of Intent and sent it to Tetra.

32.     Tetra later told Gallagher that the deal could not go forward without additional security.

33.     Gallagher then contacted Orix and asked Orix to put together a new proposal.

34.     Thereafter, Gallagher had one or two phone conversations with Secrist in which Secrist told him that he could not get the deal approved with a ten percent buyout, but assured Gallagher that he could get the deal approved with a twelve percent buyout.

35.     On December 22, 2005, Tetra informed House of Flavors by e-mail that the financing had been credit-approved on the condition that House of Flavors provide a security deposit and a letter of credit.  Tetra stated that "[a]ll other terms and conditions of the initial proposal will remain the same."  E-

---

sure it is a non-binding agreement. We, you know, we didn't use, or we didn't do an estimate of the equipment.
Q  So are you saying, are you telling us the language here was just lifted from another letter, that's why it reads that way?
A  Well, other than the number that's in there, yes, we used it from another letter based on the intent of the request.
Q  And then it has this language about non-commitment, correct?
A  Correct.
Q  Is that from the other letter too?
A  It is.

mail & Attach. from Secrist to wgallagher@proteingroup.com (Dec. 22, 2005) (Joint Ex. 3).

36. Shortly after receiving the revised terms from Tetra, Gallagher—apparently not yet content with the Tetra deal—told Holmes that he would "giv[e] Orix the go[-]ahead." E-mail from Gallagher to Holmes (Dec. 22, 2005) (Def.'s Ex. 31). But House of Flavors's deal with Orix never was submitted for credit approval.

37. On January 5, 2006, Gallagher informed Secrist that House of Flavors accepted Tetra's revised terms and requested that Tetra begin preparing lease documents.

38. Shortly thereafter, also on January 5, 2006, Emery sent Gallagher a revised side letter ("second side letter") from Secrist, identical to the first side letter except that it referred to Tetra's December 22, 2005 e-mail and stated that Tetra estimated an end-of-term value at *twelve* percent of the equipment's original cost.

39. In fact, as Secrist knew, contrary to the side letter, no one at Tetra had estimated or otherwise calculated an end-of-term value for the leased equipment by January 5, 2006.

40. In March 2006, Tetra and House of Flavors executed a lease, dated January 13, 2006, that provided:

    a. House of Flavors had three options at the end of the lease term: (i) "purchase all, but not less than all" of the equipment "for a price to be agreed upon" by the parties; (ii) "extend the Lease for twelve

(12) additional months"; or (iii) return the equipment. Master Lease Agreement § 19(d) (Joint Ex. 10).

b. If the parties could not agree on a price and if House of Flavors elected not to return the equipment, the lease extended for twelve months. Id.

c. "At the conclusion of the extension period . . . the Lease shall continue in effect . . . for successive periods of six (6) months each subject to termination at the end of any such successive six-month period" by either party upon notice. Id.

d. Tetra had all rights of ownership. Id. § 8(a).

e. The lease was an integrated contract, id. § 19(a), governed by Utah law, id. § 19(f).

Contrary to the Letter of Intent and the side letters, the lease did not include either a fixed purchase price or a cap on a purchase price. No provision in the lease provided for transfer of ownership to House of Flavors at the end of any extension period. Nevertheless, Secrist and Scharman (Tetra's CEO) testified that, if House of Flavors did not purchase or return the tri-tray system at the end of the base lease term, ownership of the equipment would transfer automatically from Tetra to House of Flavors after eighteen months (a twelve-month extension and a six-month extension).[7]

---

[7] On direct examination by House of Flavors, Secrist testified as follows.
    Q In a situation similar to what House of Flavors has, what would happen to the equipment at the termination?
    . . . .
    A My understanding is at that point, if we terminate . . . then they would own the equipment.

*(continued on next page)*

41.     House of Flavors provided Tetra with a $502,296 letter of credit and a security deposit of $35,502.  House of Flavors, Inc. Fin. Statements, Years Ended Sept. 30, 2007 & Sept. 24, 2006, at 14 (Joint Ex. 13); House of Flavors, Inc. Fin. Statements, Years Ended Sept. 28, 2008 & Sept. 30, 2007, at 13 (Joint Ex. 14).

42.     From March to August 2006, Tetra funded the installation of the tri-tray system in the House of Flavors plant at a cost of $1,435,130.36.

43.     On August 30, 2006, House of Flavors executed a bill of sale of the tri-tray system, transferring ownership of the equipment to Tetra.  See Bill of Sale (Joint Ex. 15).

44.     Also on August 30, 2006, House of Flavors and Tetra executed an amended lease schedule that incorporated by reference the terms and conditions of the Master Lease Agreement and provided for a thirty-six month base lease term, total funding of $1,435,130.36, and monthly payments of $43,972.39 (plus tax).  Am. & Restated Lease Schedule No. 1 (Def.'s Ex. 11).[8]

---

Q  That they own the equipment?
A  That they would—that title would transfer back to them of the equipment.
Q  So that should be in the master lease agreement, that provision?
A  Something to that effect is in there, yes.  I don't know exactly how it reads but that is how I understand it.

On direct examination by Tetra, Scharman offered similar testimony.

Q  If there is no agreement with the lessee on an end of term purchase price, is there a way for this lease to end?
A  Absolutely . . . .  Once they have provided [notice], then they can go through those options, and there is absolutely an opportunity for them to terminate the lease once all obligations under that lease have been satisfied.  When that happens, we terminate the lease, transfer of the property goes to the lessee.
Q  So if there is no agreement on a purchase price, it goes to an extension?
A  Yes. . . . At the conclusion of that six-month extension after the initial lease extension, they can provide us notice and the lease terminates.
Q  At that point, the property becomes theirs?
A  The property becomes theirs absolutely.

[8] The amended lease schedule also provided for a deposit of $43,972.39 to be applied to the
*(continued on next page)*

45.     Holmes prepared financial statements for House of Flavors's internal use reflecting the twelve percent end-of-term value,[9] but House of Flavors's external auditors did not include it in financial statements because the lease provided for three end-of-term options.

46.     In August 2008, Gallagher approached Tetra about an early termination of the lease by means of a buyout.

47.     To provide Gallagher with a buyout price, Scharman reviewed Tetra's documentation file for the House of Flavors transaction.  The file did not include the first or the second side letters about end-of-term value that Secrist had sent Gallagher.

48.     On August 28, 2008, Tetra informed House of Flavors that House of Flavors could buy the tri-tray system for $542,958.26, approximately forty percent of the original cost of the equipment.   See E-mail from Secrist to wgallagher@proteingroup.com (Aug. 27, 2008) (Joint Ex. 11).

49.     Gallagher asked Secrist why Tetra was not offering a price at twelve percent in accordance with the second side letter, and Secrist stated that he did not have the side letter.  Gallagher then sent him a copy.

50.     When Scharman asked Secrist about the status of the House of Flavors account, Secrist told him that Gallagher was frustrated with the forty percent offer and told Scharman about the side letters.

---

last billing period.  Am. & Restated Lease Schedule No. 1 (Def.'s Ex. 11).
[9] Holmes's amortization schedules reflect a start date of August 30, 2006 and an end date of August 1, 2009; an initial payment on August 31, 2006 of $2,816.49; and fixed monthly payments of $43,972.39.  Amortization Schedule, Oct. 2, 2006, at 1 (Pl.'s Ex. 18); Amortization Schedule, Dec. 11, 2006, at 1 (Pl.'s Ex. 20).

51.     Scharman did not investigate the circumstances that led Secrist to send either the first or the second side letter to Gallagher.

52.     Tetra subsequently offered a buyout option at thirty-five percent and later at thirty percent of cost, but Gallagher refused to budge from the twelve percent estimate of the second side letter.

53.     On January 30, 2009, House of Flavors notified Tetra of its intention to purchase the equipment at twelve percent of cost pursuant to the side letter of January 5, 2006.  Letter from Whitcomb Gallagher to Tetra Re: Master Lease Agreement (Jan. 30, 2009) (Def.'s Ex. 29).

54.     Tetra did not formally respond to House of Flavors's January 2009 attempt to exercise the option to buy at twelve percent of cost.

55.     In February 2010, House of Flavors incurred additional financing fees of approximately $13,000 to maintain its $502,296 letter of credit as a guaranty on the Tetra lease.

56.     As of April 14, 2010, House of Flavors had paid Tetra $1,769,319 pursuant to the lease.[10]

## II.  CONCLUSIONS OF LAW

1.     House of Flavors is a Maine corporation; Tetra is a Utah limited partnership; more than $75,000 is at stake.  Jurisdiction is therefore based on

---

[10] At trial, the parties stipulated the amount of funding that Tetra provided to House of Flavors and the amount of the rental payments that House of Flavors had made pursuant to the Master Lease Agreement.  The stipulation did not include the number of monthly payments, but House of Flavors has subsequently represented that the stipulated amount represents forty-two monthly payments.  Pl.'s Post-Trial Br. at 7 (Docket Item 93).  Tetra has not objected to this representation.  However, the stipulated total payment to Tetra is not equal to forty-two monthly payments of the amount listed in House of Flavors's amortization schedules or in the amended lease schedules.

diversity of citizenship. 28 U.S.C. § 1332(a). The lease provides, and the parties agree, that Utah law governs the substantive issues.

**A.      *Fraudulent Inducement***

2.      Under Utah law, to prevail on its fraudulent inducement claim, House of Flavors must show by clear and convincing evidence that Tetra made a representation of a "presently existing material fact," that was false and that Tetra knew to be false (or that it made recklessly, knowing that there was insufficient knowledge upon which to base such a representation), for the purpose of inducing House of Flavors to act upon it; and that House of Flavors, acting reasonably and in ignorance of its falsity, did in fact rely upon it and was thereby induced to act to its injury and damage. <u>Daines v. Vincent</u>, 190 P.3d 1269, 1279 (Utah 2008) (citation omitted).

### *(i) Representation of a Presently Existing Material Fact*

3.      In November 2005, Secrist (and Emery) represented to Gallagher that Tetra typically could close lease-finance deals at buyout prices of between ten and twelve percent of cost; that Tetra had, in fact, run the numbers on the House of Flavors deal; and that Tetra had estimated an end-of-term value and buyout price at ten percent of original cost for this deal. Later, they changed that number to twelve percent.

4.      Whether Tetra had in fact run the numbers on the deal and could provide Gallagher with an end-of-term value or buyout price that he could use in valuing the Tetra deal, as compared to that of a competitor, was a then presently existing material fact.

### *(ii) Falsity*

5.     Secrist and Emery knew that their assertion was false because they knew that Tetra had not estimated an end-of-term value or buyout price for the House of Flavors deal by either reviewing or appraising the equipment or calculating the cost of funds.  Their representation that Tetra had calculated an end-of-term value or buyout price at ten (or twelve) percent of cost was knowingly false.

### *(iii) Purpose of False Representation*

6.     Secrist and Emery knew both that Gallagher wanted to buy the tri-tray system at the end of any lease and that he wanted a solid buyout price from Tetra in order to value the deal and compare it to other offers.  Gallagher had told them that he could not agree to a deal without a buyout number.  Secrist and Emery told Gallagher that Tetra had estimated the buyout price in order to persuade him to sign a lease with Tetra rather than with a competitor.

At trial, Secrist and Emery testified that Gallagher came up with a twelve percent value on his own and that Gallagher knew that no one had actually appraised the equipment or "estimated" its cost.  I find this testimony not credible.  Gallagher testified that he understood that to evaluate the transaction, Tetra would analyze the economics of the deal to determine a buyout price that guaranteed Tetra an acceptable profit.  Gallagher made clear that he wanted to know that price so that he could value the deal against the competition.  Whatever the phrase "estimated an end of term value of ten percent" means in the first side letter, it certainly does not mean that Tetra had done *nothing*.  Rather, at a minimum, the plain language of both side letters

states that Tetra had done a calculation of some kind.  Tetra's witnesses could not explain why Gallagher would request a financially and legally meaningless estimate.  Tetra also could not explain why it would provide such a letter—especially considering that Secrist and Emery knew that if Tetra provided a nominal buyout price, it would probably not be able to maintain its preferred tax treatment of the lease.  By contrast, Gallagher convincingly testified that he was worried, given prior experience, that House of Flavors could end up on the hook for more than it bargained for and that he needed a reliable estimate from Tetra of the lease's total cost.  Gallagher may have floated the idea that to be competitive, Tetra had to offer a buyout price in the ten-to-twelve percent range.  However, I find that the evidence is overwhelming that Secrist and Emery gave Gallagher the fraudulent end-of-term value/price estimate to get him to finance the project with Tetra.

### (iv)  Reasonable Reliance

7.     Secrist and Emery did not tell Gallagher that Tetra had not actually calculated a buyout price; Gallagher did not know that Secrist had simply recycled an existing side letter in sending the "estimate."  In context, the side letter appeared genuine.  It referred to a previous conversation and to a list of property to be purchased.  Gallagher had a previous conversation with Secrist and Emery days before about a buyout price and, at Emery's request, had sent Tetra a list of equipment.  House of Flavors could and did reasonably rely on the representation that Tetra had estimated an end of term value of ten, then twelve, percent, that would guide the final buyout.  While the letter did not, on its face, create a contract or promise to sell, it could reasonably be

understood as a reliable representation that Tetra had evaluated the economics of the transaction and calculated that it could make a sufficient profit by selling the equipment at the end of the term for twelve percent of cost, within the range that Emery and Secrist told Gallagher that Tetra usually operated. The fact that the letter did not create a legally binding commitment to buy or to sell is consistent with the structure of the lease as a tax lease because it maintains all three end-of-term options and does not contractually bind Tetra to offer a nominal price for the buyout.

8.     As a result of Tetra's fraud, House of Flavors entered into a lease contract by which it has spent, or will have to spend, more money than it otherwise would have if the fraud had not occurred.

9.     Tetra argues that as a matter of law, Gallagher could not have reasonably relied on Secrist's and Emery's false oral representations about their estimation of the buyout price given Tetra's later, contradictory written statements both in the side letters and in the lease itself.  <u>See</u> Def.'s Post-Trial Br. at 13 (Docket Item 92).  Tetra relies on <u>Gold Standard v. Getty Oil Co.</u>, 915 P.2d 1060, 1068 (Utah 1996), where the Utah court stated that "a party cannot reasonably rely upon oral statements by the opposing party in light of contrary written information," <u>id</u>. at 1068 (citation omitted)).  But the Utah court has also held more recently that reasonable reliance on oral representations that conflict with written materials depends on the "facts of the individual case." <u>See</u> <u>Youngblood v. Auto-Owners Ins. Co.</u>, 158 P.3d 1088, 1096 (Utah 2007).[11]

---

[11] In <u>Youngblood</u>, an insurance agent met with a customer and orally misrepresented what a
*(continued on next page)*

At trial, there was no evidence that Tetra told House of Flavors that the buyout price was completely open[12] or that Gallagher learned that Secrist and Emery had lied about the value estimate before House of Flavors signed the lease. Rather, the evidence is that Tetra explained the peculiarities of the language in the side letters by representing to House of Flavors that it could not include a provision for the purchase of the equipment at less than twenty percent of cost or it would lose the ability to treat the financing arrangement as a tax lease. Moreover, rather than contradicting the first side letter, Tetra reemphasized its content and reassured Gallagher that it had calculated a reliable buyout price by sending the second side letter in January 2006.[13] Thus, House of Flavors could reasonably believe that Tetra had calculated the financing of the deal and that a twelve percent purchase price would give it a satisfactory profit and guide its negotiations on a buyout price. Gallagher needed to know this in

---

policy would cover. Youngblood v. Auto-Owners Ins. Co., 158 P.3d 1088, 1095 (Utah 2007). After the meeting and after agreeing to purchase the insurance, the customer received a copy of the policy, but did not read it and instead "relied solely" on the agent's oral statements, id. at 1091, which turned out to be "in direct conflict with the language of the policy," id. at 1095. Yet the Youngblood court treated reasonable reliance as a triable question of fact rather than a question of law for summary judgment and suggested that at trial it would be necessary to consider the oral representations in the context both of the relationship between the agent and the customer and of the written contract at issue. Id. at 1096. In sum, the court stated that when a writing is "clear, direct, understandable to ordinary people, and complete, it will be *more difficult* to prove reasonable reliance on contrary oral promises." Id. (emphasis added). It did not say *impossible.* I note that in Gold Standard, the Utah Supreme Court found that a party had not reasonably relied on an oral promise because it subsequently received multiple written communications that "explicitly indicated that the situation was not as [the plaintiff] understood it to be." Gold Standard v. Getty Oil Co., 915 P.2d 1060, 1067 (Utah 1996). That is not what happened here.

[12] Of course, the price is not really open. Scharman and Secrist testified that Tetra assumed that regardless of what the lease says, at the outside, House of Flavors would own the equipment after the base lease term and eighteen months of extension. So, in fact, Tetra did contemplate selling the equipment at a much higher price than it "estimated" in its correspondence with House of Flavors.

[13] Emery forwarded the second side letter with an e-mail that stated simply, "Hi Whit, Attached is the updated side letter. Thanks." Email from Greg Emery to Whit Gallagher (Jan. 5, 2006) (Joint Ex. 5).

order to determine both whether to go forward with the deal and whether Tetra's offer was competitive with other financing arrangements.

I conclude that Gallagher reasonably relied on Secrist's and Emery's oral and written representations that Tetra had calculated an end-of-term value/buyout price based on the information that he had provided.

### *(v) Reliance in Fact*

10.     Gallagher relied on the end-of-term value/buyout price provided by Tetra to determine how much the lease would cost House of Flavors and considered the Tetra deal to be a viable option because he could calculate a total cost.  He testified credibly that he would not have signed the lease with Tetra without assurances about the final cost of the lease.  House of Flavors's internal bookkeeping also reflects that the company had relied on Tetra's representations as to the total cost of the transaction.

### *(vi)  Injury*

11.     Tetra argues that House of Flavors has not shown by clear and convincing evidence that it has been injured.  Def.'s Post-Trial Br. at 13-14.[14] In Utah, as in most jurisdictions, remote, contingent, and speculative harm does not constitute a cognizable injury.  See Graham v. Street, 270 P.2d 456, 459 (Utah 1954).   But the injury here is not speculative.   The difference between what House of Flavors could expect to have paid, if Tetra had honestly estimated the end-of-term value of twelve percent price, and what House of

---

[14] Tetra correctly notes that "because House of Flavors has not sought to recover damages for fraud, it was not required to prove the *amount* of its damages" but is required to prove "the existence of damages" (injury) as part of its prima facie case.  Def.'s Post Trial Br. at 13 n.3 (Docket Item 92).

Flavors has now in fact paid Tetra can be calculated easily.  See Atkin Wright & Miles v. Mountain States Tel. & Tel. Co., 709 P.2d 330, 336 (Utah 1985) (explaining that if evidence "give[s] rise to a reasonable probability that the plaintiff suffered damage as result of a breach[,] . . . [t]he amount of damages may be based upon approximations").  If at the end of the lease's base term, House of Flavors had been able to purchase the equipment at twelve percent of cost, the total cost of the lease would have been less than the $1,769,319 that the parties have stipulated that House of Flavors has already paid Tetra.[15] Thus, House of Flavors has proven the *fact* of injury by clear and convincing evidence.

12.    I therefore conclude that House of Flavors has proven all the elements of fraudulent inducement under Utah law.

**B.    *Promissory Estoppel***

13.    Under Utah law, the elements of estoppel must be proven by a preponderance of the evidence.  See Andreason v. Aetna Cas. & Sur. Co., 848 P.2d 171, 176 (Utah Ct. App. 1993).

14.    House of Flavors pleaded promissory estoppel, which applies when "a party promises that things will be a given way in the future, knowing at the time of the promise all of the material facts, but is ultimately wrong, and where

---

[15] I base my analysis of injury first, on the parties' trial stipulation; second, on the Amended and Restated Lease Schedule No. 1 of August 30, 2006; and third, on House of Flavors, Inc. Financial Statements, Years Ended September 28, 2008, September 30, 2007, and September 24, 2006.  With a base lease term of thirty-six months and a monthly rental payment of $43,972.39, the total cost of the base lease term would have been $1,582,992.  The total that Tetra advanced on House of Flavors's behalf was $1,435,130.36.  Twelve percent of $1,435,130.36 is $172,216.  The total cost of the transaction (exclusive of taxes and fees for letters of credit) based on a buyout at the end of a thirty-six month base term would therefore have been $1,755,222.

the other relied on that promise in acting." <u>Youngblood,</u> 158 P.3d at 1092.  To prevail on a promissory estoppel claim, a plaintiff must show that "(1) [it] acted with prudence and in reasonable reliance on a promise made by the defendant; (2) the defendant knew that the plaintiff had relied on the promise which the defendant should reasonably expect to induce action or forbearance on the part of the plaintiff or a third person; (3) the defendant was aware of all material facts; and (4) the plaintiff relied on the promise and the reliance resulted in a loss to the plaintiff." <u>Id</u>. (citation omitted).[16]

15.    House of Flavors has not shown that Tetra ever *promised* that it would sell the equipment at a buyout price of twelve percent of cost.  Instead, the oral and written commitments and assurances disclaim any such promise to sell.  The misrepresentation here concerned not a future fact but a presently existing fact.

16.    I conclude therefore that House of Flavors has not proven promissory estoppel.

## C.    *Remedy*

17.    House of Flavors has chosen not to seek money damages and instead seeks equitable relief such as rescission or specific performance.  Pl.'s Trial Br. at 1 (Docket Item 65) (rescission); Pl.'s Post-Trial Br. at 4 (Docket Item 93) (specific performance of buyout at twelve percent of cost); Compl. at 9

---

[16] At the summary judgment stage, House of Flavors argued that promissory estoppel could apply due to procedural unconscionability.  Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. at 12-13 (Docket Item 24).  At trial and thereafter, House of Flavors has not developed an argument based on unconscionability, and the relief it has requested is not consistent with a finding of unconscionability, which would render the contract (or a provision of the contract) void rather than merely voidable.  I conclude that House of Flavors has forfeited its unconscionability argument for promissory estoppel.

(Prayer for Relief for Fraud) (Docket Item 1) ("Plaintiff demands . . . such relief and remedy for fraud as the Court may deem to be appropriate . . . and for such other and further relief as the Court may deem just and proper.").

18.    The Utah Uniform Commercial Code ("UCC") provides:  "Rights and remedies for material misrepresentation or fraud include *all* rights and remedies available under this chapter [concerning leases] for default."  Utah Code Ann. § 70A-2a-505(4) (emphasis added).  One of those remedies is that the lessee may "cancel the lease contract" and "recover so much of the rent and security as has been paid and is just under the circumstances."  Utah Code Ann. § 70A-2a-508(1).  This is obviously an equitable remedy, analogous to rescission.[17]  I observe that under Utah law, rescission traditionally is not technical, but practical.  <u>Ong Int'l (U.S.A.) v. 11th Ave. Corp.</u>, 850 P.2d 447, 457 (Utah 1993) ("The status quo rule 'is not a technical rule, but rather it is equitable, and requires practicality in adjusting the rights of the parties.'" (quoting <u>Dugan v. Jones</u>, 724 P.2d 955, 957 (Utah 1986)).  It is designed "to restore the parties to the status quo *to the extent possible or as demanded by the equities* in the case."  <u>Dugan</u>, 724 P.2d at 957 (emphasis added) (citations omitted).[18]  Moreover, as further explained below, "[n]either rescission nor a claim for rescission . . . may bar or be deemed inconsistent with a claim for

---

[17] Because I have found no contract to sell, specific-performance-type relief is probably not an appropriate remedy.  <u>See</u> <u>Pitcher v. Lauritzen</u>, 423 P.2d 491, 493 (Utah 1967) ("The court cannot compel the performance of a contract which the parties did not mutually agree upon.) (citation omitted)).

[18] Likewise, "it is not the intent of equity actions . . . to punish a transgressor or to permit any party, whether innocent or not, to reap a benefit from the fraudulent transaction that he would not have reaped if the transaction had not taken place."  <u>Horton v. Horton</u>, 695 P.2d 102, 107 (Utah 1984).  Instead, the party seeking rescission must "return . . . the benefits received by him that he otherwise would not have received."  <u>Id.</u>

damages or other right or remedy." Utah Code Ann. § 70A-2a-505(5); <u>see also</u> Utah Code Ann. § 70A-2a-501(4) (providing that remedies under Article 2a are "cumulative").

19. Tetra argues that principles of rescission would be extremely difficult to apply here because, to unwind the transaction completely, House of Flavors would need to tear out all the equipment that it did not possess prior to the lease and "turn over to [Tetra] all of the benefits House of Flavors enjoyed by virtue of the use of all the equipment." Def.'s Post-Trial Br. at 9. Tetra maintains that fully unwinding the transaction would require "extensive discovery and expert opinion regarding the value of the property and both the nature and the extent of the benefits it conferred on House of Flavors as well as the value of those benefits." <u>Id</u>.

Applying principles of rescission in this case is not so complicated, however, especially given the flexibility of the UCC's remedy provisions. Tetra loaned money—$1,435,130.36—to House of Flavors through a lease financing transaction. The benefit to House of Flavors was the value or cost of borrowing that money. In exchange, House of Flavors conveyed title to the ice cream hardening system to Tetra and paid Tetra a total of $1,769,319 in monthly rental payments for the thirty-six month base term and part of a twelve-month extension period.[19] To put the parties back in the *status quo ante*, title to the

---

[19] There is some uncertainty as to when House of Flavors began and stopped (or even whether it has stopped) making payments under the lease and about how many payments House of Flavors made. In its Post-Trial Brief, House of Flavors represented that payments were made from April 2006 to September 2009. Pl.'s Post-Trial Br. at 7 (Docket Item 93). Based on the parties' stipulation at trial as to the total amount paid ($1,769,319) and the documentary evidence at trial, House of Flavors appears to have paid a deposit of one monthly payment *(continued on next page)*

hardening system must transfer from Tetra back to House of Flavors. (Tetra's Scharman and Secrist testified that Tetra always planned on that outcome, and Tetra's attorney argued that both parties understood that the lease provided for transfer of title.) This can be accomplished by a transfer of title now.[20] In addition, it is necessary to "cancel the lease contract" under the statutory remedy. Utah Code Ann. § 70A-2a-508(1)(a).

The remaining question is how much House of Flavors should recover of the rent or security that it has paid to Tetra. The UCC allows a defrauded party to recover "so much of the rent and security as has been paid and is just under the circumstances." Utah Code Ann. § 70A-2a-508(1)(b). To determine what is just here, I consider that if the remedy were common law rescission, House of Flavors would have to return the loan of $1,435,130 to Tetra and pay Tetra "the fair rental value" or interest on the loan. Dugan, 724 P.2d at 957. House of Flavors has already paid back the principal of the loan in full. The question is thus how much interest House of Flavors should pay on the loan. House of Flavors notes that Gallagher testified that Orix offered a financing package with a 7.67 percent interest rate on December 22, 2005 (with a one dollar end-of-term buyout option) and argues that I should treat the Orix rate as a reasonable market rate of interest. Pl.'s Post-Trial Br. at 7 (Docket Item

---

($43,972.39), an initial partial monthly payment ($2,816.49) in August 2006, and approximately thirty-nine or forty regular monthly payments from September 2006 until up until March 2010, when this case was originally scheduled for trial. For the purposes of calculating damages, the precise number of payments is immaterial because the total payment has been stipulated.

[20] It could also be accomplished by rescission of the August 2006 bill of sale, which originally transferred title from House of Flavors to Tetra. A transfer of title, however, seems cleaner, unless the parties prefer otherwise.

93). However, I observe that House of Flavors did not successfully consummate the Orix deal at 7.67 percent. At trial, moreover, Scharman testified that Tetra borrowed money for this transaction from Republic Bank at 9.5 percent interest, a higher amount. It is reasonable to infer from the trial testimony that Tetra, as a leasing company with a regular relationship with a syndicate bank, could borrow on better terms than House of Flavors, which was highly leveraged in 2005-2006. I conclude that 7.67 percent interest, therefore, is too low an interest rate for House of Flavors to pay.[21] Gallagher testified, however, that based on his calculations, he considered the implicit interest rate in the Tetra transaction (with a buyout at twelve percent of cost) to be commercially competitive. Gallagher Trial Test. Tr. 50:2-14, Apr. 13, 2010 (Docket Item 94).[22] I conclude that it is just under the circumstances for House of Flavors to pay interest at the implicit rate that Gallagher believed he had obtained based on Tetra's fraud. The cost of the transaction that Gallagher believed he had was $1,755,222 (thirty-six monthly payments of $43,972.39 plus a buyout at twelve percent of cost or $172,216). That value is also the baseline for determining that House of Flavors has suffered an injury due to Tetra's fraud. Tetra must therefore disgorge any monies it has received from House of Flavors in excess of $1,755,222. Based on the parties' stipulation that House of Flavors has paid a total of $1,769,319, Tetra must

---

[21] At Tetra's 9.5 interest rate, the total cost of the loan ($1,435,130) for a base thirty-six month term would be $1,654,972.
[22] At trial, Gallagher acknowledged that he had erred in calculating the imputed interest rate for both Tetra and Orix, Gallagher Trial Test. Tr. 50:9-14, but that does not change my conclusion that it is just to limit recovery to the terms of the Tetra transaction that he believed he had obtained.

disgorge $14,097.[23]  (If House of Flavors has continued to make payments after the effective date of the stipulation, Tetra must also disgorge those payments.) Tetra must also reimburse House of Flavors $13,000 for extra financing fees that House of Flavors incurred to maintain its letter of credit beyond September 2009 and must return to House of Flavors any security deposit paid under the lease and release the letter of credit and other security provided by House of Flavors to Tetra.

20.    Tetra argues that House of Flavors waived any claim to rescission-type relief by retaining the "benefits of the lease after discovering the alleged fraud in August 2008, by declining to assert a rescission claim in its January 2009 complaint, and by failing to bring a claim for rescission until days before trial in March 2010."  Def.'s Post-Trial Br. at 4.  But in its Complaint, House of Flavors requested all available relief that Utah law provides for fraud.  See Compl. at 9 (Prayer for Relief) (demanding "such relief and remedy for fraud as the Court may deem to be appropriate . . . and for such other and further relief as the Court may deem just and proper.").  Tetra was therefore on notice that rescission was a possible outcome in this case.  Nevertheless, Tetra argues that under Utah law, "a party waives his right to rescind a contract if he remain[s] in possession of the property received by him under the contract" or "if he uses the property which was the subject of the sale after he discover[s] . . . the

_____

[23] If House of Flavors had paid interest at Tetra's rate with Republic Bank for the three-year base term, Tetra would now have to disgorge approximately $114,347 ($1,769,319 in total payments minus $1,654,972, the total transaction cost of a three-year loan of $1,435,130 at 9.5 percent interest).  Such a remedy would effectively provide House of Flavors with better terms than those offered by Tetra or Orix in 2005, a result that is not just under the circumstances.

ground for rescission." Def.'s Post-Trial Br. at 4 (quoting <u>Cont'l Ins. Co. v. Kingston</u>, 114 P.3d 1158, 1161-62 (Utah Ct. App. 2005). The Utah cases cited by Tetra are not persuasive here, because House of Flavors all along was trying to enforce what it believed the contract to be; if it had succeeded, it would not have sought rescission. This is not a case where House of Flavors's conduct was inconsistent with seeking the alternate remedy of rescission if it could not succeed on its contract claim. Utah case law instructs me to determine whether a party has waived a right to rescission by "consider[ing] all of the relevant facts" and to base my decision upon the "totality of the circumstances." <u>Cont'l Ins. Co.</u>, 114 P.3d at 1161 (citation omitted). Here, considering all the facts of the case, I find that House of Flavors never intentionally gave up the right to seek rescission for fraud.

## III. CONCLUSION

For the reasons discussed herein, it is **ORDERED**:

1.     Judgment shall enter in favor of House of Flavors on its fraud claim.

2.     Judgment shall enter against House of Flavors on its promissory estoppel claim.

3.     The lease is hereby cancelled.

4.     Within thirty (30) days of this Order, Tetra shall:

   a. Tender to House of Flavors $27,097 ($14,097 in excess interest payments plus $13,000 in financing fees);

   b. return all security deposits provided by House of Flavors pursuant to the lease; and

c.  release any and all other forms of security, including letters of credit, that House of Flavors provided pursuant to the lease.

d.  Transfer ownership of the ice cream hardening equipment to House of Flavors.

**SO ORDERED.**

**DATED THIS 17TH DAY OF JUNE, 2010**

/s/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**